UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY

In re:

|  |  |
|---|---|
| JERRY OTIS HORTON and<br>PAMELA MICHELE HORTON | Case No. 06-32113 |
| Debtors | CHAPTER 7 |

_____

|  |  |
|---|---|
| CHRISTINE BOHANNON and<br>MARGRETT DOLAN | Ad. Proc. No. 06-03160 |
| Plaintiffs |  |

vs.

JERRY OTIS HORTON and
PAMELA MICHELE HORTON

Defendants

---

## MEMORANDUM OPINION

---

THIS CORE PROCEEDING[1] comes before this Court on the nondischargeability complaint filed by Christine Bohannon and Margrett Dolan ("Creditors") against Jerry Otis Horton, one of the debtors in the underlying bankruptcy ("Debtor"), on grounds that the Debtor obtained a sum of money from the Creditors under a contractual agreement through false representations, false pretenses, or fraud and that the debt owed by the Debtor is, therefore,

---

[1] 28 U.S.C. § 157(b)(2)(I).

1

nondischargeable under 11 U.S.C. § 523(a)(2)(A).[2]  Specifically, the Creditors argue that the Debtor knowingly made false representations regarding the quality of work he would perform and whether he had an insurance policy to insure the work he would perform.  The Creditors assert that they relied detrimentally on these misrepresentations when they entered into the remodeling contract and suffered damages as a result of the Debtor's conduct.  The Debtor asserts in response that he did not have the requisite fraudulent intent and that, at worse, his conduct in performing construction and remodeling under the contract amounts to gross negligence that constitutes a breach of contract but not fraud.  This Court finds that the Debtor did not have the requisite fraudulent intent under 11 U.S.C. § 523(a)(2)(A) and that the debt that is the subject of this litigation is, therefore, DISCHARGEABLE.

## FINDINGS OF FACT

The Creditors in this case are Christine Bohannon ("Bohannon") and her elderly mother, Margret Dolan ("Dolan").  Bohannon owns a home located at 247 Homestead Avenue, Hardin County, Kentucky ("Homestead Avenue house").  The Homestead Avenue house was originally a double-wide trailer with two bedrooms and a bathroom.  Bohannon and Dolan agreed that Dolan would move into Bohannon's home.  In order to accommodate Dolan, they planned for Bohannon to have a sixteen foot by fifty-five foot addition constructed on the residence consisting of another bedroom and a mud room, along with other interior remodeling to the original building.  Dolan agreed to fund these renovations.

Bohannon obtained bids from different parties and decided to accept the Debtor's

---

[2] The Creditors' complaint also alleged that the Debtor should be denied a discharge altogether under 11 U.S.C. § 727(a)(2), but this claim was subsequently dismissed by order of the Court.

proposal because it looked more professional than the bids she obtained and because she had known him for several years. Bohannon claimed the Debtor represented to her that he had liability insurance that would insure the quality of his work. The Debtor had been in the construction and remodeling business for approximately eight years, and he showed Bohannon renovations he had done on his own trailer as an example of his work.

On December 30, 2003, Bohannon entered into a contract with the Debtor. Under the terms of this contract, the Debtor was to construct and finish the addition, including construction and shingling of a pitched roof over the addition, installation of new windows, insulation, and installation of vinyl siding outside the entire home. The only work under this first contract that was to be done to the original structure was replacing the original front porch with a new one, installing vinyl siding on the original structure to match the siding installed around the new addition, and "boxing in" all of the original windows.

Under the terms of this original contract, the Creditors paid the Debtor a down-payment of $10,000 and agreed to pay the payroll for the Debtor's employees in advance for the first eight weeks of the work. Under the agreement, the remaining payroll was not to be paid until the work was complete. The contract included language in three different places by which the Debtor guaranteed that the work would be performed in a workmanlike manner. Of note was the handwritten guarantee stating "All work on workmanship will be Gauarntee [sic]" which was the fifteenth and final item to be performed under the contract.

Bohannon entered into a second written agreement with the Debtor on January 7, 2004, which included twelve items of renovation that the Debtor would perform. Eleven of the twelve items provided for under this contract were new obligations that were not addressed in the first

3

contract. Significantly, the second contract did not contain any language providing who would be responsible to pay the payroll, as the first contract did. In all, the Creditors advanced the Debtor over $30,000 to pay for materials and paid more than $20,000 for the labor while the work was being performed.

Sometime around March or April 2004, the relationship between Bohannon and the Debtor began to sour. According to her testimony, Bohannon was dissatisfied that the Debtor and his employees would start numerous projects under the contract before other projects were completed. Furthermore, after a home inspection that was conducted on January 21, 2004, revealed deficiencies in the work the Debtor (and other parties) had performed, Bohannon began to doubt whether the Debtor's work would ever pass a home inspection.

According to Bohannon's testimony, the relationship between the Debtor and Bohannon finally ended after she became suspicious that the Debtor was using the credit account she funded for work on her home to purchase materials for work performed on other job sites for other customers. Bohannon explained that the Debtor refused to complete the work due under the contract when she refused to pay him additional money, but she emphasized that she had already paid more than the eight weeks of payroll required by the original contract. The Debtor testified that he did not perform all of the work under the contract because he had redirected materials and resources from the work due under the contract to other projects he and Bohannon agreed he would perform on the Homestead Avenue house, though this agreement was never documented in writing.[3] When she became unable to reimburse him for the work they orally

---

[3]There is circumstantial evidence corroborating the existence of such an agreement between the Debtor and Bohannon, *e.g.*, drywall repair work performed by him in the existing structure that was not required under either of the two written contracts.

agreed to, he credited the value of that work against the remaining work due under the contract and refused to perform further under the contract until he was paid. He also kept the vinyl siding he had partially installed and then removed as payment for some money he was owed.

When the working relationship between the Debtor and Bohannon ultimately failed, the renovations to the Homestead Avenue house were either substantially incomplete or of substandard quality. Ed Bryan ("Bryan"), a building inspector for the Hardin County Planning and Development Commission, testified that he inspected the Homestead Avenue house on three separate occasions, including the aforementioned January 21, 2004, inspection. His inspection revealed numerous building code violations, *viz.*, a masonry foundation wall lacked the required concrete footing, rebar reinforcements, vents, and an access door to the crawlspace; several horizontal two-inch by eight-inch floor joists that supported the floor of the addition were improperly attached to the vertical four-inch by four-inch posts that supported the entire structure; girders that were constructed with two, two-inch by eight-inch pieces of lumber did not have the appropriate "band board" at the open ends of the joists; a beam across the kitchen ceiling was insufficiently supported and was sagging as a result; and missing baffles in the attic to ensure adequate airflow. Bryan was unable to determine whether certain other features of the construction were in compliance with the building code because construction had passed the point that an inspection could be performed.[4]

---

[4] For example, the building code requires that each vertical four-inch by four-inch post be set in two feet of concrete. Normally, an inspection of these holes would be conducted before the concrete footers are poured. In this case, an inspection of the holes was not feasible because the posts had already been set in the holes with concrete, and Bryan was unable to ascertain whether these holes were the required two feet deep. He conceded these holes could have been the proper depth. Bohannon testified that she dug around five or six of the vertical four-inch by four-inch posts and determined that there were between thirteen and sixteen inches of concrete

5

In addition to the deficiencies addressed by the home inspections, Bohannon testified to the following unsatisfactory or incomplete construction performed by the Debtor: (1) a hole in the kitchen floor that had been exposed when the original sink was moved as part of the renovation; (2) damage to the duct work under the original portion of the home; (3) an unaligned doorway passing from the existing structure to the new addition that did not match up with the doorway in the newly constructed wall such that the metal from the old exterior wall of the trailer stuck out into the new doorway several inches; (4) tongue and groove flooring installed in the existing kitchen that was not level; (5) drywall on the ceiling that was three-eights of an inch thick rather than the required half-inch minimum; and (6) approximately twelve sheets of drywall in various places through the house that were sagging or falling and had to be repaired.

The substantial inadequacies of the work performed by the Debtor was corroborated by the testimony of Clay Fischer, a builder who Bohannon called to the Homestead Avenue home in 2004 to inquire about repairing or completing the work, either to bring the construction in compliance with the building code or simply to make the construction properly functional. Fischer testified that several newly-installed windows would not open or close properly and were not level with the vertical and horizontal planes of the house. Three or four doors would not open properly because they were out of plumb. The floors in the addition were not level. The horizontal ceiling beam in the kitchen was sagging downward roughly one-half inch. In some sections of the house, wood sheet flooring was laid over existing linoleum or carpeting.

During trial, Bohannon attempted to characterize the Debtor as the general contractor for all of the work that was performed on her house during the time in question. The Debtor

---

rather than the twenty-four inches required by the building code.

disputed this, arguing that he was the contractor for all of the work that he agreed to perform under the contract, but no more. Although the Debtor was responsible for a substantial portion of the construction and renovation that was being performed, he was not acting as a general contractor for all of the work being performed on Bohannon's home. Bohannon had also had masonry work, plumbing work, electrical work, and heating and air conditioning work done on the Homestead Avenue residence. With respect to each of these other services, Bohannon, not the Debtor, contacted, negotiated with, and paid the service people.

Significantly, the work performed by the Debtor was not the only work that failed to comply with the building code. Bohannon, not the Debtor, obtained the building permit before any of the work began on her home. Before the Debtor began work on the Homestead Avenue home, Bohannon had contacted someone to build a masonry wall around the base of the home, including the area where the new addition was later built. This masonry wall failed Bryan's inspection because it lacked the necessary concrete footings or other reinforcements required by the building code. The electrician that Bohannon hired left substantial work unfinished and in a state that would not pass an electrical inspection. Bohannon testified that the electrician had been paid in advance for work that he had yet to perform and that she was no longer able to contact him.

Bohannon's testimony at trial lacked credibility. In more than one instance, she made statements that she contradicted at other points or that were contradicted by her own witnesses.[5]

---

[5]Bohannon testified on cross examination that the Debtor had warned her that the flooring in the Kitchen would be uneven due to flaws in the existing support system for the original structure. In rebuttal, however, Bohannon denied that the Debtor ever warned her that the flooring would likely be uneven. Likewise, Bohannon disputed that the Debtor ever lived in the Homestead Avenue home with her. Both the Debtor and Bruce Alan—one of Bohannon's

7

Furthermore, some of the substandard work of which Bohannon complained appeared to have been performed, at least in part, by the Debtor, then altered by Bohannon or someone else after the Debtor left the Homestead Avenue residence for the final time.[6]  Lastly, Bohannon repeatedly attempted to characterize the Debtor as the general contractor for all of the substandard work performed at her home.  The facts presented at the hearing, however, persuaded this Court that Bohannon and not the Debtor acted as the general contractor for the addition to the Homestead Avenue home.[7]

## CONCLUSIONS OF LAW

11 U.S.C. § 523(a)(2)(A) states in pertinent part:

(a) A discharge under section 727, 1131, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

Exceptions to the discharge of a debt are to be strictly construed against the creditor and liberally

---

witnesses—testified that the Debtor did live with Bohannon (and Alan) many years earlier.

[6] For example, Bohannon complained that the Debtor had never installed trim around a few split-jamb doors.  The photographic evidence presented by her, however, shows an unpainted strip around the doorway the width of customary door trim.  This unpainted strip on an otherwise painted wall indicates to the Court that trim had been installed around the doors, but that the trim had been removed after the painting was finished.

[7] Bohannon obtained the building permit, hired the mason to build the exterior masonry wall, the electrician, the plumber, and the heating and air conditioning contractor.  The fact that the Debtor recommended the electrician is of little significance, because he did not coordinate with, supervise, or pay any of these other parties for work they performed.

in favor of the debtor.  *Gleason v. Thaw*, 236 U.S. 558, 561-62, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Taylor v. Kaufmann (In re Kaufmann)*, 57 B.R. 644, 646 (Bankr. E.D. Wis. 1986).  The party who seeks the exception to discharge bears the burden of proof.  *In re Bogstad*, 779 F.2d 370, 372 (7th Cir. 1985).

To except the discharge of a particular debt under 11 U.S.C. § 523(a)(2)(A), the complainant must prove the following:  "(1) the debtor obtained money through a material misrepresentation that, <u>at the time</u>, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss."  *Rembert v. AT&T Univ'l Card Svcs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998) (emphasis added) (footnote omitted); *see also Lee-Benner v. Gergely (In re Gergely)*, 110 F.3d 1448, 1453 (9th Cir. 1997); *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986).  Whether a debtor had the requisite fraudulent intent to warrant an exception to discharge under 11 U.S.C. § 523(a)(2)(A) is a subjective inquiry.  *Field v. Mans*, 516 U.S. 59, 70-72, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995).  Fraudulent intent may be established by direct as well as circumstantial evidence.  *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424 (7th Cir. 1985).  These elements must be proved by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

In the case *sub judice*, Bohannon alleges two different material misrepresentations to support her allegation of fraud:  (1) that the Debtor had an insurance policy covering the quality of his work, when he did not; and (2) that he guaranteed the quality of his work when he knew the work he would produce would be substandard.

### 1. Insurance

With respect to Bohannon's claim that the Debtor misrepresented that he maintained liability insurance to insure the quality of his work, this argument was not pursued during the trial, and almost no testimony was provided by any of the Plaintiffs' witnesses on this subject. The Debtor was never asked whether he currently had an insurance policy or whether he held an insurance policy at the inception of the contract that subsequently lapsed.

Furthermore, even with sufficient proof that the Debtor did make a misrepresentation regarding insurance, Bohannon would have to prove that she relied on that misrepresentation in entering the contract with the Debtor. Bohannon offered no testimony to support her attorney's pretrial statements that such an insurance policy was a substantial reason for her acceptance of the Debtor's proposal instead of one of the other bidders'. The great majority of her testimony at trial addressed the inadequacies of the Debtor's (and others') work on her home.

Lastly, Bohannon has cited no precedent to support her claim that a misrepresentation regarding such an insurance policy that is made when an agreement is entered is, in fact, material under 11 U.S.C. § 523(a)(2)(A). For the foregoing reasons, this argument fails.

### 2. Guarantees Regarding Quality of Work

With respect to Bohannon's argument that the Debtor's guarantees regarding the quality of his work constitute material misrepresentations, Bohannon has failed to prove by a preponderance of the evidence that the Debtor had the requisite fraudulent intent when he made guarantees regarding the quality of his work at the inception of the contract or that she relied on those misrepresentations when she entered into the agreement. Despite the Debtor's guarantees regarding quality and customer satisfaction, the work done on the residence was clearly

substandard, and some of the repairs might actually cause further damage to the home if left unrepaired over time. However, "subsequent conduct contrary to original representation does not necessarily render the original representation a falsity." *Garza v. Baker (In re Baker)*, 139 B.R. 692, 694 (Bankr. N.D. Ohio 1992). The evidence presented by the parties shows that the Debtor did spend several months working in the Homestead Avenue residence, and there were many modifications that explain the time and energy expended, including the full addition.

Even after the first inspection on January 21, 2004, the Debtor continued to work on the house for roughly two more months and attempted to correct at least one of the deficiencies cited in the first home inspection. Furthermore, Bryan testified that it appeared that the Debtor had actually tried to build the support structure under the addition in such a manner that it would not depend on the substandard masonry wall for support at all—like a "pole barn." This fact supports the conclusion that the Debtor actually intended to perform the work due under the contract and that, though he may be accused of incompetence as a builder, he did not intend to defraud Bohannon at the time the contracts were entered. "[L]anguage in a sales contract stating that a contractor will build a home in good and workmanlike manner according to specifications does not amount to a misrepresentation merely because the contractor breaches that promise." *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996).

> [I]t is clear that the second and third elements set forth above have not been proven. For these particular elements to be present, the plaintiffs had to show that when the parties entered into the agreement, the defendant knew he was incompetent to build this addition, that notwithstanding this knowledge, he represented to the plaintiffs that he could satisfactorily perform the work, and that he made this representation with the intent and purpose of deceiving the plaintiffs so that they would sign the contract. The facts do not demonstrate that this is what occurred. Instead, the court is persuaded that when the defendant entered into the agreement with the plaintiffs, he intended to complete this work satisfactorily and sincerely believed he could do so, but that during the course of

11

>construction, he encountered unanticipated problems which he was unable to resolve. It is a case of the defendant having bitten off more than he could chew. . . . Under these circumstances, the debt is not excepted from discharge under § 523(a)(2)(A).

*Taylor v. Kaufmann (In re Kaufmann)*, 57 B.R. 644, 646-47 (Bankr. E.D. Wis. 1986).

The cases relied upon by Bohannon are inapposite. *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214 (1st Cir. B.A.P. 2002), dealt with the burden of proving causation for a party seeking an exception to discharge under 11 U.S.C. § 523(a)(2)(A). *Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 217-18 (1st Cir. B.A.P. 2002). Although the First Circuit's Bankruptcy Appellate Panel did not dispute the Rhode Island bankruptcy court's finding that an intentional misrepresentation regarding being a licensed professional may be sufficiently material to support a finding of fraudulent intent under 11 U.S.C. § 523(a)(2)(A), that case dealt with a debtor who misrepresented that he was a refrigeration and air conditioning contractor who was licensed by the Rhode Island Department of Labor and Training. *Creta*, 271 B.R. at 216.

*Lee-Benner v. Gergely (In re Gergely)*, 110 F.3d 1448 (9th Cir. 1997), dealt with the appeal of a bankruptcy court's dismissal of a nondischargability proceeding brought by a party who was injured by the negligent performance of a medical procedure by an obstetrician who allegedly made false misrepresentations regarding the necessity of the procedure. *Lee-Benner*, 110 F.3d at 1450-51, 1453. Neither the lower court's dismissal of the claim nor the Ninth Circuit's treatment of the claim on appeal addressed the significance of the involvement of a professional who is governed by a licensing body.

Furthermore, in the case *sub judice*, Bryan testified that Hardin County has no licensing or testing requirements for contractors. Even if the Debtor had been acting as a general contractor, he never made any misrepresentation regarding whether he was licensed because his

12

field is not governed by any licensing body.  This fact alone distinguishes the cases cited by Bohannon from the case at bar.  Moreover, for purposes of a purported misrepresentation under 11 U.S.C. § 523(a)(2)(A), courts ordinarily distinguish a knowing misstatement of a prior fact, which ordinarily falls within § 523(a)(2)(A), and a promise of future performance that is subsequently not performed, which ordinarily does not.[8]  *See, e.g.*, *Kadlecek v. Ferguson (In re Ferguson)*, 222 B.R. 576, 585-86 (Bankr. N.D. Ill. 1998) (Debtor misrepresented that he was a signatory to an exclusive "Code Plus" custom home builders agreement, when he was not, and that he would have home designs approved by a licensed architect, which he did not.); *Barr*, 194 B.R. at 1018 ("[T]he Rezins did not prove by preponderance of the evidence that Bruce Barr's statement that he would build a house in a good and workmanlike manner was a false pretense, false representation, or actual fraud."); *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 994-95 (Bankr. M.D.N.C. 1994) (Debtor knowingly created false impression that he was a licensed general contractor and used a false licensing number.), *abrogated on other grounds by Cohen v. de la Cruz*, 523 U.S. 213, 217-18, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998); *Peoples Sec. Fin. Co. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983) ("False representations and false pretenses encompass statements that falsely purport to depict *current or past facts*." (emphasis in original)).

      This Court laments that Bohannon has little recourse against the Debtor for the woefully substandard work he performed on her home.  Nonetheless, her claim against him appears to be one for breach of contract rather than fraud.  Furthermore, the proof of claim filed by

---

[8]There are, of course, exceptions to this distinction, *e.g.*, if a complainant could prove that a debtor made knowingly false promises of future performance with the intent to defraud.

13

Bohannon's attorney states that the basis for the claim was "breach of contract," and there was no mention of fraud anywhere in the proof of claim. Bohannon has not directed this Court to any case precedent that equates proof of the performance of substandard work with proof of fraudulent intent. Moreover, such a precedent could not feasibly exist without elevating nearly every breach of contract action to a level of actionable fraud, as inherent in most contractual obligations for services is some guarantee as to the quality of the work to be performed.

For the foregoing reasons, this Court finds that the debts arising from the work performed by the Debtor on Bohannon's home are dischargeable. This Court will enter a separate Order consistent with this Memorandum Opinion.